UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RAYMOND ANTOINE SCOTT JR., <br><br> Petitioner, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent. | Case No. 3:18-cv-00172-BLW <br><br> **MEMORANDUM DECISION AND ORDER** |

Petitioner Raymond A. Scott Jr.'s Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255 is now fully briefed and ripe for adjudication. Dkt. 1, 3.[1] Having reviewed the parties' filings and considered the record in this matter and in the related criminal matter, the Court enters the following Order denying the Motion.

## BACKGROUND

On July 9, 2013, Petitioner was visiting the home of William Reich (nicknamed "Bear"). Two teenaged boys saw Reich leave his home holding his bloodied head in his hands. Reich told the boys that "Ray" "cheap-shotted" him in the back of the head with an ax, hammer or hatchet." Crim. Dkt. 69, p. 4. Afterwards, four different witnesses heard Petitioner admit to killing Bear:

---

[1] All references to the docket are to the civil docket in this case, unless otherwise designated "Crim. Dkt.," referring to the underlying criminal case No. 3:14-cr-00060-BLW-1, *USA v. Scott*.

MEMORANDUM DECISION AND ORDER - 1

- I killed my bro' (witness A.S., Petitioner's daughter).
- I killed Bear (witness Eric Jackson).
- I just killed someone, I'm going to jail for the rest of my life, I'm going to take you [Dale West] out before I go" (witness Jessica Vasquez).
- I took an axe and took down the largest man in Lapwai (witness Christine Bann).

*Id*. at 5.

Petitioner evaded police in a car and on foot for hours after the crime. Later the same evening, he was arrested. Reich died in the hospital on the morning of July 10, 2013. The autopsy report concluded that he died from "a chop wound of the scalp, skull, and brain." *Id*.

On March 18, 2014, a federal grand jury indicted Petitioner for first degree murder, alleging that he "willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill[ed]" Reich "by striking him in the head with an instrument which caused his ... death." Dkt. 1-1. On March 31, 2014, Petitioner was arraigned. The federal public defenders were appointed to represent him on that same date.

On August 12, 2014, CJA attorney Noel Pitner substituted in as counsel for Petitioner. The court reset the trial date several times so the parties could prepare for trial. Finally, May 4, 2015 was the date set for the trial to begin.

Mr. Pitner filed Petitioner's trial brief on April 17, 2015. In that brief, Mr. Pitner set forth Petitioner's defense:

> Most importantly, the evidence will show that no murder weapon has been recovered or offered by the United

MEMORANDUM DECISION AND ORDER - 2

> States. In addition, none of the scientific reports and DNA testing that has been conducted links Defendant to the murder of William Reich, including fingerprint, DNA, and blood analysis. There also are no eyewitnesses to the purported killing of Mr. Reich by anyone, let alone the Defendant himself.
>
> In this case the evidence will show that the United States will be unable to meet its burden of showing that Defendant was responsible for the death of William Reich, premeditated or not. Any statements from witnesses called by the United States offered to prove that Defendant murdered William Reich will be shown through cross-examination to be untrue, procured while the witnesses were under the influence of drugs or alcohol or fabricated to implicate the Defendant and falsely identify him as Mr. Reich's killer.

Crim. Dkt. 69, pp. 4-5. Mr. Pitner disclosed that he intended to call seven witnesses, including members of Petitioner's family who were parked outside the residence when the alleged altercation occurred, medical first responders who treated Mr. Reich at the scene, a blood spatter expert, and perhaps Petitioner himself. *Id*., p. 3.

A week before trial, the parties reached a plea agreement. Petitioner agreed to plead guilty to second degree murder, to waive a grand jury indictment for that charge, and to waive his right to appeal, and Respondent agreed to "recommend a sentence at the low-end of the sentencing guideline range" at the sentencing hearing. Dkt. 3-1. By pleading guilty to second degree murder, Petitioner avoided a mandatory life sentence if a jury were to find him guilty of first degree murder. 18 U.S.C. § 1111 (indicating that First Degree Murder is punishable by "death or by imprisonment for life").

On May 4, 2015, Petitioner waived indictment and pleaded guilty to the superseding indictment charging him with second degree murder. Dkt. 3-1. After a

MEMORANDUM DECISION AND ORDER - 3

sufficient colloquy regarding Petitioner's guilt, the plea bargain proceedings, and his waiver of a jury trial and other constitutional rights, the Court accepted Petitioner's guilty plea as "knowledgeable and voluntary." *Id*., p. 21.

The presentence report concluded that, taking into consideration Petitioner's acceptance of responsibility for the crime, his total offense level was 35. His criminal history category of V, translating into a federal sentencing guidelines sentence range of 262 to 327 months in prison. *Id*. at 6, 18. Neither party objected to that guideline calculation.

United States Probation recommended a sentence of 327 months. Crim. Dkt. 90. Both Respondent and Petitioner recommended 262 months. Crim. Dkts. 88, 91. On July 28, 2015, Petitioner appeared in court with counsel for sentencing. Dkt. 3-2. The Court reviewed the facts of the crime, Petitioner's background and history, the need to promote respect for the law, deterrence factors, Petitioner's need for vocational and education training, and Petitioner's past violent crimes. The Court found that "the probation office was more than justified in ... recommending the top end of the guideline sentence"—362 months, based on Petitioner's "persistent assaultive behavior," including assaults on "unsuspecting victim[s]." *Id*. at 32-33. While in the absence of the parties' recommendations for less, the Court would have pronounced a sentence of 362 months, its decision was "tempered by the joint recommendation made by the government and defense." *Id*., pp. 33-34. Therefore, the Court sentenced Scott to 288 months in prison, followed by five years of supervised release. *Id*., p. at 34-36.

The Court takes judicial notice that Petitioner's trial counsel, Noel Pitner, was disbarred by the Idaho Supreme Court on March 27, 2020. *See* Exhibit 1 to Order. He was suspended from the practice of law in Idaho in 2017, two years after he represented Petitioner in his federal criminal matter. *See id.*

## STANDARD OF LAW

Title 28 U.S.C. § 2255 provides four grounds under which a federal court may grant relief to a federal prisoner who challenges the imposition or length of his or her incarceration: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States;" (2) "that the court was without jurisdiction to impose such sentence;" (3) "that the sentence was in excess of the maximum authorized by law;" and (4) that the sentence is otherwise "subject to collateral attack." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that a federal district court judge must dismiss a § 2255 motion "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." In order to proceed on a § 2255 motion, the movant must make "*specific factual allegations* that, if true, state a claim on which relief could be granted." *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984) (citation omitted) (emphasis added).

"Under this standard, a district court may summarily dismiss a § 2255 motion only if the allegations in the motion, when viewed against the record, do not give rise to a claim for relief or are 'palpably incredible or patently frivolous.'" *United States v. Withers*, 638 F.3d 1055, 1062-63 (9th Cir. 2011) (citation omitted).

MEMORANDUM DECISION AND ORDER - 5

A defendant is entitled to effective assistance of counsel at all stages of a criminal proceeding, including plea negotiations, trial, and sentencing. *United States v. Leonti*, 326 F.3d 1111, 1116-17 (9th Cir. 2003). The well-established two-prong test for evaluating ineffective assistance of counsel claims consists of a showing of deficient performance and resulting prejudice. *See Strickland v. Washington*, 466 U. S. 668 (1984).  A defendant must show that counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 688, 697.  *See also Bell v. Cone*, 535 U.S. 685, 695 (2002).  Mere conclusory allegations are insufficient to state a claim of ineffective assistance of counsel.  *See Shah v. United States*, 878 F.2d 1156, 1161 (9th Cir. 1989).

To establish deficient performance, a defendant must show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result" or that "counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 686-87.  There is a strong presumption that counsel's performance fell "within the wide range of reasonable professional assistance," and judicial scrutiny of that performance must be "highly deferential." *Id*. at 689.

To establish prejudice, a defendant must affirmatively prove by a reasonable degree of probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694.  This standard is "highly demanding." *Kimmellman v. Morrison*, 477 U.S. 365, 381-82, 86 (1986) (noting that the court should

MEMORANDUM DECISION AND ORDER - 6

"assess counsel's overall performance throughout the case" when evaluating whether his assistance was reasonable).The *Strickland* two-part test applies when a defendant contends that his counsel was constitutionally inadequate during the guilty plea process. *Hill v. Lockhart*, 474 U.S. 54, 58 (1985).  In the guilty plea context, a defendant must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 58-59. Rather than simply being able to say he would have proceeded to trial, a defendant must show the likelihood of a more favorable outcome at trial. *Id*.

Both prongs of the *Strickland* test must be met "before it can be said that a conviction (or sentence) 'resulted from a breakdown in the adversary process that render[ed] the result [of the proceeding] unreliable' and thus in violation of the Sixth Amendment." *United States v. Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005) (quoting *Strickland*, 466 U.S. at 687).  In evaluating an ineffective assistance of counsel claim, the Court need not consider one prong if there is an insufficient showing of the other. *Strickland*, 466 U.S. at 697.

## ANALYSIS

In his § 2255 Motion, Petitioner brings two ineffective assistance of counsel claims, each of which has several subparts. Dkt. 1. Respondent has divided and characterized the claims as five separate claims. Petitioner has not objected to that characterization, and so the Court considers the claims as five different claims, as Respondent has briefed them.

1.     **First Claim**

Petitioner's first claim is that Mr. Pitner had him sign the plea agreement without any review. Petitioner states that Mr. Pitner "never went over it with me, and just had me sign it, and after I did he just abruptly left the building. Not once did he ever go over the agreement with me, and he's never provided a copy of it to me to this date." Dkt. 1-1, p. 3. Petitioner asserts: "I was totally unaware of what I signed." Dkt. 1-1, p. 2. Petitioner relies on his own declaration from 2018 to support his claim.

Petitioner's 2018 declaration under penalty of perjury stands in contrast to Petitioner's sworn statements made during the change of plea and sentencing hearings in 2015. At the change-of-plea hearing on May 4, 2015, Petitioner testified that, "[p]rior to signing the plea agreement" he "read *each provision*" and "went over *each provision* with his attorney." Dkt. 3-1, p. 17 (emphasis added). In addition, Petitioner affirmed that he had "adequate time" to meet with his attorney and that he "understood each provision of the plea agreement before [he] signed it." *Id.*, pp. 7-8, 17.

In addition, the Court went over in detail many of the provisions of the written plea agreement in open court and asked Petitioner additional questions. *Id.*, pp. 17-21. The Court also clearly explained to Petitioner how the sentencing recommendations and final sentence selected would be calculated, and that, once pronounced, Petitioner would have to serve the entire sentence, because there is no parole for federal crimes. The Court further explained that the maximum sentence was life imprisonment, and that probation was not an option. *Id.*, pp. 8-13. Therefore, even if Petitioner did not tell the Court the truth during sentencing (and there is no indication that Petitioner had any incentive not to

MEMORANDUM DECISION AND ORDER - 8

tell the truth), the Court carefully went over the terms of the written plea agreement in open court, as well as the potential consequences.

Petitioner's answers at the change-of-plea hearing indicated that he understood the contents of the plea agreement. Both the Court and Petitioner's counsel verified that Petitioner was competent to plead guilty on the day of the hearing, and Petitioner answered "yes," when the Court asked him "Do you understand what is happening today?" *Id.*, p. 4.

In instances where a defendant comes into court and testifies one way before he knows his sentence, and then testifies another way after he has been sentencing, the United States Supreme Court has observed:

> [T]he representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). *See also United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008) (affirming that a defendant's in court statements should be given the "strong presumption of veracity in subsequent proceedings attacking the plea"); *United States v. Kaczynski*, 239 F.3d 1108, 1114 (9th Cir. 2001) (affirming the "substantial weight" given to a defendant's in-court statements).

Accordingly, it is not a matter of determining that the Petitioner is altogether noncredible in his testimony and declarations, but that the Petitioner already had been

MEMORANDUM DECISION AND ORDER - 9

deemed competent at the time he first testified at the change-of-plea hearing, that he entered his guilty plea in a knowing and voluntary manner, and that he did not then know his sentence at that time, and, thus, had less motive to testify falsely, as compared to a declaration made after his sentence is known. Here, Petitioner has not convincingly set forth facts showing why his in-court testimony should now be found not credible. Petitioner had no reason to say that he had read *each provision* of the written plea agreement if he actually had not. To the contrary, his vague and contradictory new statements made after he received a longer sentence than he had hoped for are less credible and are insufficient to show that his counsel performed deficiently under the *Strickland* standard.

It is true that Mr. Pitner was suspended from the practice of law in 2017 and disbarred in 2020, but those facts alone do not show that he rendered ineffective assistance in Petitioner's case in 2015. Petitioner must still show that, in his particular case, Mr. Pitner performed deficiently, and that the deficiency caused prejudice to Petitioner's defense. Given that the Court reviewed the important parts of the written plea agreement with Petitioner, and he indicated his understanding and assent, even if Mr. Pitner did not go over the written plea agreement with Petitioner, he has not shown any prejudice to his defense. Therefore, this claim will be denied.

2.  **Second Claim**

Petitioner's second claim is that Mr. Pitner never provided him with a copy of the presentence report and never explained the contents to him. After being sworn in the

sentencing hearing on July 28, 2015, Petitioner said he had reviewed the presentence report. Dkt. 3-2, p. 4. Mr. Pitner confirmed that he had an opportunity to review the presentence report with Petitioner. *Id*. Petitioner and Mr. Pitner did not make any objections to the presentence report. When the Court said that no objections had been made, Petitioner did not do anything in court indicating that he actually had any objections.

Petitioner now says, that, contrary to what he said under oath in the 2015 hearing, he did not read the presentence report and did not consult with Mr. Pitner about the report. He gives no explanation why he would have been untruthful to the Court under oath in 2015. Nor does he identify any objectionable information contained in the report that he wanted to raise at the 2015 sentencing hearing. Petitioner has not met either the deficient performance or the prejudice prong of an ineffective assistance of counsel claim. Accordingly, this claim will be denied.

3. **Third Claim**

Petitioner alleges that, during his first meeting with Mr. Pitner, Petitioner concluded that Mr. Pitner "wouldn't represent me effectively" if Petitioner decided to proceed to trial. Dkt. 1-1, p. 2. Petitioner came to this conclusion after he told Mr. Pitner that he and Bear got into an altercation, Bear grabbed a hammer, Petitioner armed himself in self-defense, Bear approached him in a very aggressive manner, and then Petitioner hit Bear in the head. *Id*. Petitioner was unhappy with Mr. Pitner's response, which was that, because Petitioner was a willing participant in the altercation, he was reckless and

aggressive, and would be found guilty of murder at trial. *Id*. Later, Petitioner saw a statement from the United States' witness Mark Arthur, who said that he saw Bear with a hammer, which supported Petitioner's version of events. *Id*., p. 3. Petitioner asserts that Mr. Pitner told him that if he pleaded guilty, he would get 15 years, but if he went to trial, he would get a life sentence. *Id*. Petitioner felt that he had no choice but to plead guilty.

But, at the change-of-plea hearing, Petitioner did not express his current position that he wanted to proceed to trial but believed he could not do so because his attorney would not support Petitioner's theory of defense.

> Court: Have you had adequate time to discuss your case with your attorney?
> Petitioner: Yes.
> Court: Are you satisfied with the representation that he has provided you?
> Petitioner: Yes.

Dkt. 3-1, p. 5.

Instead of telling the Court that Mr. Pitner would not support Petitioner's self-defense assertion and felt he would not properly represent him at trial, Petitioner specifically admitted to the allegations in the information that are directly contrary to a self-defense theory:

> Court: Do you agree that you unlawfully killed Mr. Reich?
>
> Petitioner: Yes.
>
> Court: Do you agree that you did so with malice aforethought?

MEMORANDUM DECISION AND ORDER - 12

        Petitioner:    Yes.

        Court:    You did so with intent to take his life; is that correct?

        Petitioner:    Yeah.

Dkt. 3-1, p. 16.

    Nor did Petitioner tell the Court that he was pleading guilty only because Mr. Pitner and the United States' attorney predicted that he would be sentenced to only 15 years. The Court clearly told Petitioner that he could be sentenced up to life in prison, even under the plea agreement. Dkt. 3-1, pp. 12-13, 18. Petitioner said he understood that, even though the government agreed in the written plea agreement to recommend a bottom of the guideline sentence, the Court "would not be bound by that and could impose a sentence above that." *Id.*, p. 19. Petitioner admitted that no one made promises to him to induce him to plead guilty. *Id.*, p. 18.

    Petitioner said he understood that, by pleading guilty, he was giving up his right to appeal his sentence, "even if the sentence is longer than the government recommends and longer than the sentenced called for by the guideline range." *Id.*, p. 19. There was no better time than that to tell the Court that Petitioner's counsel told him that he and the United States' attorney believed he would get no more than 15 years. But Petitioner said nothing.

    Indeed, at the sentencing hearing in May 2015, Petitioner said, "I just want to say I understand the serious nature of my crime and that I deserve whatever, whatever you give me." Dkt. 3-2, p. 27. Again, that would have been another really good time to say he

MEMORANDUM DECISION AND ORDER - 13

expected a sentence of no more than 15 years. Rather, this statement seems to acknowledge that Petitioner would accept any sentence permitted by the law.

Nothing in the record support Petitioner's claim that he could not exercise his choice to go to trial because his attorney was not supportive of Petitioner. In fact, the record reflects that Mr. Pitner was prepared to go to trial on a perfectly-acceptable theory that the government could not prove that Petitioner killed Bear with or without premeditation. Mr. Pitner had witnesses ready, including an expert witness. While Petitioner states that one witness said Bear had a hammer, four witnesses said that Petitioner bragged to them about having killed Bear—not that Bear had attacked him and he had no choice but to defend himself. Petitioner has not shown that Mr. Pitner was unprepared for trial or that he had not picked a reasonable defense theory. The most substantial mar on Mr. Pitner's theory was Petitioner's own behavior of bragging about the killing to four witnesses. His bragging would have destroyed a self-defense theory and would have required that he testify at trial, while Mr. Pitner's chosen theory left open the door to either calling Petitioner or permitting him to remain silent and thus not subjecting him to cross-examination. Pleading guilty also effectively reduced Mr. Pitner's sentence; the Court indicated it would have sentenced Petitioner to the high-end of the sentencing guidelines as recommended by the probation office, but chose to impose a lesser sentence because of the joint recommendation for a low end guideline sentence made by Petitioner and the United States.

Petitioner has not shown that Mr. Pitner performed deficiently in trial preparation, defense theory selection, or a recommendation to plead guilty. Nor has Petitioner shown

MEMORANDUM DECISION AND ORDER - 14

that he was prejudiced by Mr. Pitner's performance or by pleading guilty. Accordingly, this claim will be denied.

**4.      Fourth Claim**

Petitioner's fourth claim is that Mr. Pitner did not discuss trial defenses with him, such as a possible manslaughter defense or a self-defense option. Dkt. 1-1, p. 4. Respondent asserts that Petitioner's claim is entirely conclusory, is not supported by any part of the record, and should be dismissed, citing *United States v. Keller*, 902 F2d 1391, 1395 (9th Cir. 1990) (holding that a petitioner "must make specific factual allegations that entitle him to relief); and *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993) (finding conclusory statements insufficient).

Petitioner asserts that, when he first met Mr. Pitner, he told him that an altercation occurred, and that he picked up and struck Bear in self defense only after Bear picked up a hammer and approached him. Mr. Pitner rejected that set of facts as supporting a defense, and told Petitioner that he would be sentenced to life in prison if he chose to go to trial.

As discussed above, Mr. Pitner chose a safer defense that did not rest on the precarious foundation of Petitioner's own testimony. Mr. Pitner did not want to suggest to the jury that manslaughter was a better option, when he could argue that there was no evidence that Petitioner killed Bear with or without malice.

Further, the Court noted at sentencing that it was "reported on the day of the offense, [Petitioner] drank to the point of blacking out and does not have any clear

MEMORANDUM DECISION AND ORDER - 15

memory of the offense." *Id*. Therefore, it would have been very difficult for Petitioner to testify about his version of events at trial, had Mr. Pitner chosen a self-defense theory. Nor does it appear that other witnesses had testimony helpful to his case, other than the one witness who saw Bear with a hammer.

Petitioner has failed to meet his burden to show that Mr. Pitner did not evaluate the potential viable defenses—given the facts at hand—or the potential outcomes if he were to proceed to trial. Petitioner has not shown that his proposed defenses were stronger than Mr. Pitner's chosen defense. Actually, the opposite is true. Petitioner does not bring forward facts showing that it was reasonably likely that he could have prevailed at trial under his chosen theories. Petitioner has shown neither deficient performance nor prejudice, and this claim will be denied.

5.      **Fifth Claim**

Petitioner asserts that Mr. Pitner predicted that Petitioner would receive a fifteen-year prison sentence and warned him he could get a life sentence if he went to trial. Dkt. 1-1 pp. 2-4. Petitioner affirmed under oath at the change-of-plea hearing that no one had promised him a particular sentence. Dkt. 3-1, p. 18. A prediction is not a promise, and, regardless, the Court clearly explained to Mr. Pitner that, even if the United States and Mr. Pitner recommended the bottom of the guidelines sentence, the Court was free to select any sentence it desired. In fact, the Court told Petitioner that, because he was giving up his right to appeal, the Court could sentence him even more harshly than the guidelines recommended. Petitioner has not alleged that Pitner promised that the sentence

would be 15 years, and the Court's admonition to Mr. Pitner that any sentence up to life could be imposed, shows that no prejudice resulted from any prediction Mr. Pitner may have made about a 15-year sentence.

In addition, Petitioner reviewed the presentence report that contained the advisory guideline range, 262-327 months, which is a far cry from 180 months (15 years). Even if Petitioner did not read the report as he testified he did, he heard the Court say at the sentencing hearing that the range was 262-327 months. He heard his counsel and the United States' attorney recommend 262 months, not 180. And yet he did not object or ask his counsel to object. As set forth above, during his allocution, Scott did not mention any concern about why the discussions were about 262 months, rather than 180 months, but simply said: "I deserve whatever, whatever you give me." *Id.* at 26.

Therefore, the record before the Court tends to show that Petitioner did not believe he would receive only a 15-year sentence, but that he knew he could receive a sentence of up to life. Petitioner has not shown deficient performance in any such "prediction," but even if Mr. Pitner performed deficiently with a prediction, then no prejudice resulted, as the Court cleared up any possible mistaken view that Petitioner would receive any particular sentence. This claim is subject to denial.

Petitioner further alleges that Pitner said he would not continue representing him if he did not take the plea agreement. The record belies Scott's claim. First of all, Petitioner did not plead guilty until the day that the trial was supposed to begin; therefore, it is clear that Pitner intended to continue, and did, in fact, represent Petitioner all the way through

MEMORANDUM DECISION AND ORDER - 17

the date of trial. Second, at the change-of-plea hearing, Petitioner testified that no threats or promises had been made to force him in any way to plead guilty. *Id.*, p. 18.

Third, Petitioner sought to take advantage of the United States offering him a third level for acceptance of responsibility for making a timely plea of guilty, even though, technically, to warrant that, he should have pleaded guilty the Friday before the Monday trial date, not on the trial date. However, the United States' attorney stated at the change-of-plea hearing that it was willing to recommend the third-point reduction anyway. If Petitioner was pleading guilty merely as the result of a threat, he would not have taken responsibility for the intentional killing, as the crime was charged. Fourth, even at the sentencing hearing, Petitioner did not tell the Court that he felt he was coerced into pleading guilty by a threat of his counsel to withdraw.

For all of these reasons, Petitioner's fifth claim fails for lack of a showing of deficient performance of his counsel or prejudice to his defense. Accordingly, it is subject to denial.

## CONCLUSION

Petitioner has failed to support his new claims that stand in stark contrast to testimony he gave at the change-of-plea and sentencing hearings. The very first question Petitioner was asked at the change-of-plea hearing was, "[D]o you understand, that having been sworn as a witness, that if you do not answer my questions truthfully, you could later be prosecuted for perjury?" Dkt. 3-1, p. 4. Petitioner stated that he did understand. *Id*. Three years later, he offers no explanation why he would have knowingly

committed perjury at those hearings. Petitioner's testimony at those hearings is credible, and his new vague allegations are not.

Petitioner has failed to show that his counsel of record made errors that amounted to deficient performance. Neither has Petitioner shown that prejudice to his defense resulted. Accordingly, the Motion to Vacate, Set Aside, or Correct a Sentence will be denied.

## CERTIFICATE OF APPEALABILITY

A § 2255 movant cannot appeal from the denial or dismissal of her § 2255 motion unless she has first obtained a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A certificate of appealability will issue only when a movant has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

To satisfy this standard when the court has dismissed a § 2255 motion (or claims within a § 2255 motion) on procedural grounds, the movant must show that reasonable jurists would find debatable (1) whether the court was correct in its procedural ruling, and (2) whether the motion states a valid claim of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the court has denied a § 2255 motion or claims within the motion on the merits, the movant must show that reasonable jurists would find the court's decision on the merits to be debatable or wrong. *Id.*; *Allen v. Ornoski*, 435 F.3d 946, 951 (9th Cir. 2006).

After carefully considering the record and the relevant case law, the Court finds that reasonable jurists would not find the Court's decision to be debatable or wrong. A

certificate of appealability will not issue, but Petitioner may seek one from the United States Court of Appeals for the Ninth Circuit.

## ORDER

**IT IS ORDERED:**

1. Petitioner's Motion to Vacate/Set Aside/Correct Sentence Pursuant to 28 U.S.C. § 2255 (Civ. Dkt. 1) and (Crim. Dkt. 113) is DISMISSED.

2. No certificate of appealability shall issue. Petitioner may request a certificate of appealability from the Ninth Circuit Court of Appeals, pursuant to Federal Rule of Appellate Procedure 22(b) and Local Ninth Circuit Rule 22-1. To do so, he must file a timely notice of appeal.

3. If Petitioner files a timely notice of appeal, and not until such time, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the Ninth Circuit Court of Appeals. The district court's file in this case is available for review online at www.id.uscourts.gov.

DATED: November 24, 2020

B. Lynn Winmill
U.S. District Court Judge